This is 2010-1066, Chattler v. United States. Mr. Sergeant. I'm Cpl. Sgt. Mulder. I represent the Plaintiff, Julian Chattler. In 1994, Congress authorized the State Department to begin charging a fee for expedited passport processing. Congress had found that the Department was required to spend about 60% more time on expedited processing within three days than required through normal processing. The new fee was intended to ensure that the cost of expedited service would be borne by those who received the service. And unlike other passport fees, which are paid into the U.S. Treasury, the new expedited fee would be paid into an operating account for diplomatic and consular affairs. Now, in regulations to implement the new expedited fee, the State Department defined expedited processing would be completed within three days and stated in a money-mandating regulation that the expedited fee will be refunded if the agency does not provide the expedited processing that is within three days. The Department hasn't given us figures from earlier years, but from 2004 through 2007, out of about 13 million applicants who paid for expedited processing, over 5 million never received it, and less than 1% of those 5 million ever received their money back. Instead of refunding the fees, the Department has actually been taking the money out of consular affairs and using it to fund other Department programs. Julia Chattler was one of those millions who didn't receive their money back. She brought this class action under the Little Tucker Act, alleging regulatory violations and breach of contract. The District Court denied all claims. First, the Court held that the money-mandating regulation is ambiguous as to whether the fee must be refunded to someone who doesn't request it, but it's not ambiguous. Well, it says will be refunded, but it doesn't say when or how or under what circumstances. That's true, Your Honor. And the District Court said, in fact, that the regulation is ambiguous about the manner in which the fee will be refunded. But we're not talking about the manner in which it will be refunded. We're talking about whether there will be a refund at all. Under the Department's interpretation of its regulation, no refund will ever be issued in any manner to any of the millions of people who paid for but didn't receive the service and never requested a refund. Well, the question is whether this regulation requires a request for a refund or whether it provides for an automatic refund. But the regulation is silent on that. I'm sorry? In that sense, isn't it correct that it's ambiguous? I don't believe so, Your Honor. I think, first of all, the language is mandatory. It's not discretionary. But also, I don't think the words will be refunded can mean will not be refunded. If you're among the over 99 percent of the people who didn't request a refund and weren't aware of some alleged unpublished policy, that you'd have to ask court in order to get it. Well, it doesn't say it will not be refunded. No, Your Honor. It says it will be refunded. And it hasn't been for, again, over 99 percent of the people to whom it is owed. Well, it hasn't been refunded in your client's case because she has not requested a refund. And that's true for virtually everybody. Has the government ever denied the fact that she's entitled to a refund? I don't think they've said one way or the other. What they've said is that she is entitled to request a refund. So suppose we were to conclude that the regulation is, in fact, ambiguous. Do we have a statement by the Department of State on which we can rely as to how the regulation should be interpreted? No, Your Honor. Well, let me say that there's nothing, no official statement from the government that supports its interpretation. Well, the briefs do. I'm sorry? Their briefs do take that position. That's true. In Candle Corporation, we did suggest that briefs sometimes may supply an interpretation of regulation. I understand. And, of course, then there's a question about whether those briefs simply constitute post hoc rationalizations of past agency practices. Okay. Well, so let's put the briefs aside for the moment. What else do we have here? Are these instructions, are those public? No, Your Honor. They're internal? The instructions of 2075 and 2060 that were promulgated in 1994 and 1996. Those are internal? Those were internal. They were distributed to passport services agencies. Well, what about the email on the website? I guess it was June 14, 2007. Saying specifically, saying that, I think you're talking about a statement saying that people may be, may make requests for refunds. Yeah, I mean, that's a public statement, right? That's true, Your Honor. There's nothing, there's nothing that ever said, and I'd like to point out, I believe that was after Julie Chatelot filed her application. But there's nothing. But not before it was received. That's true, Your Honor. But there's nothing in that statement that says that a refund is required, a request is required in order to get a refund. And it doesn't actually specify under what grounds you would be entitled to a refund. Where do we find the email in the record here? I'm not sure which email you're talking about, Your Honor. Well, the one we've just been talking about. The June 14 record. The June 14, 2007. I'm sorry, I don't recall that specific page. Well, why don't you find it when the government is arguing, so we can look at that. Is there any other public statement by the Department about the meaning of this regulation? Well, I'd like to point out that is not a statement about the meaning of the regulation. Well, I'm putting it aside. Yes. There have never been any official public statements from the Department about its interpretation of the regulation until this lawsuit. Now, I'd like to point out that the Department's interpretation is inconsistent with the Department's own official statements in promulgating the regulation and in Instructions 2075 and 2060. First, when the Department promulgated its regulation in 1994, it explained that if it can't meet the 3-day deadline, the applicant will be notified and the fee will be refunded. In other words, it wasn't the applicant's responsibility to investigate whether the application sat at an agency for more than 3 days. It wasn't the applicant's responsibility to provide notice and initiate the refund process. It was the agency's responsibility. And that's made very clear in Passport Instructions 2075 and 2060. In addition to requiring a refund for a passport that wasn't processed within 3 days for any reason, those instructions also required the agency employee, not the passport applicant, to send a refund request to the Department's Accounting and Statistics Branch using Department of State Form 1485 within 10 days after the passport application was issued, denied, or abandoned. And Passport Instructions 2060 specifically stated that, quote, the agency which issued the original passport is responsible for requesting a refund, and the employee, not the applicant, is responsible for completing that request form. The refund checks would then be mailed from the U.S. Treasury generally within 10 days. So it's simply not true, as the government has suggested, that these procedures were never in place. They were in place from the outset. We don't know when the Department quit following these official procedures, and we don't know when the Department started taking the unearned extradite fees out of Consular Affairs and instead of refunding the money, began using it to fund other Department programs. But we know that the Department is now relying on an interpretation of its regulatory refund obligation to justify a practice that has managed to avoid refunding over 99% of the unearned fees. It's effectively transformed a congressionally mandated fee for service into a general revenue-raising scheme funded by people who did not get what they paid for. The Department says that its current practice reasonably relies on requests from dissatisfied applicants. But if your regulatory obligation is very simply to refund the fee if the service is not provided, how is it reasonable to rely on a method that demonstrably, as a matter of statistical certainty, returns less than 1% of the unearned fees that are owed? And finally, again, as the District Court acknowledged in its summary judgment ruling, an agency's interpretation of ambiguous regulatory language is not entitled to deference if it's merely a post hoc rationalization of past practices, rather than the agency's fair and considered judgment on the matter. And that's exactly what we have here. Before this lawsuit, the Department never claimed that requiring the applicant to request a refund was even consistent with, much less a reasonable interpretation of the language of the regulation. It was only in this lawsuit that the Department came up with these post hoc rationalizations for past practices, like not having an automated system that can count the days that a passport is sitting in an agency, or not knowing where to refund checks, or not wanting to spend time on refunds to people who haven't actually said that they're unhappy. But doesn't the very fact that the State Department didn't make automatic refunds for years suggest that that was the interpretation of the regulation, that they weren't required to do that? There's no evidence that they were ever interpreting the regulatory obligation. Well, let's just assume there's complete silence, okay? We have the public regulation. The Department of State has never made automatic refunds, correct? We don't know that, Your Honor. The official policy says they were required. Well, you haven't shown that they ever did, right? No, they haven't released any data about the first 10 years or so about how many refunds were actually made. We know only evidence from 2004. We've requested it further back. We've only received it from 2004. But we do know that the official internal policy was to automatically do it. So whether they did it... Where do we find that? In the passport instructions 2075 and 2006. You mean that a written request is not required? That one? Well, I'm talking about passport instruction 2060. Which is the one that you say they interpreted internally as requiring automatic refund? Both of them state that it is the passport employee who is required to send in the request to complete the form and send in the request to the statistics and accounting branch. And they say that it is the passport agency's responsibility to do this, not the applicant's. Now, in the first passport instruction in 1994, there was a statement after saying that you must refund it for any reason if the three-day requirement is not met. It then follows that up with a second statement saying, if an applicant believes that he or she is entitled to a refund,  and it doesn't say that that's a requirement for a refund request. And in 1996, two years later, when the instruction 2060 was issued, that sentence was replaced by something saying a written request was not required. So to the extent that anybody could have even been misled by that first statement in instruction 2075, 2060 very clearly said, no, that's not what we mean. It's still the obligation of the passport agency. It's very clear from both of those instructions. And we know that aside from these, what I call them post hoc rationalizations, the actual, the current practice, the Department's actual concern is documented in, for example, the memorandum from Laura Hartley, the Assistant Secretary for Consular Affairs, on July 18, 2007. The actual concern of the Department is that it's been using the unearned expedite fees to fund other programs, and it doesn't want to refund that money. And I think that's a key point. The Department doesn't want to refund the money that it owes. The Department's desire not to follow its regulatory obligation and return money to its rightful owners doesn't constitute a fair and considered judgment about that obligation. I'd like to turn briefly to the contract claims and just say, make two points. The Department says the claims are based on a non-existent implied contract, and in any event are duplicative of the regulatory claim. It's wrong on both points. First, Chattler has consistently alleged an express contract based, among other things, on the passport obligations offer of a three-day processing for $60. Chattler accepted that offer. At the very least, there was a contract when the Department accepted the fee for expedited service. And the Department's passport instructions describe its obligation as a guarantee, a promise, and a commitment. So as pleaded, and this was in the contract claims, this was judgment on the pleadings, this is an express contract. And second, the contract claims aren't merely duplicative of the regulatory claim. Liability is based on breach of contractual promises, not on an allegedly ambiguous regulation. In fact, any ambiguities in the contract have to be construed against the drafter. And Chattler's remedies are determined by contract law, not by the money-mandating regulation. So here, for $60, the Department promised three-day processing. The Department breached its promise. At the very least, Julia Chattler stated a claim in the amount of a fee paid for a service that she never received. Okay. Thank you, Mr. Sergeant. We'll save some rebuttal time. Mr. O'Bage. In the name of the court, Michael Abadie, on behalf of the United States. You guys from the Department of Justice, you come in here in other cases. Rumsfeld is an example, but there are several of them. And you say that when private parties put in affidavits from present and former government officials as to the meaning of regulations, we should ignore those, and that they're not relevant. And we've agreed with you. And then, all of a sudden, you come in in this case and you put in affidavits from government officials as to what they really thought the regulation meant. I find that to be very puzzling, that you take the position in these other cases that we can't rely on affidavits from government officials as to the meaning of regulations, and then you turn around and do the same thing in this case. Well, Your Honor, I think there are two responses to that. First of all, the affidavit in this case, I think it's the false declaration you're referring to, was submitted by an official still employed with the Department as a statement of... Well, what difference does that make? I mean, we have said, at your request, we have said, you interpret regulations by what's publicly said about them, not by the hidden intent of the officials who are administering them. And then you turn around and you ask us to do the exact opposite. No, Your Honor, I think the declaration provides relatively important context, but nonetheless, even if this Court were to conclude that the hearsay objection that was made to paragraph 8 of the false declaration... It's not a question of hearsay. It's a question of it's not being public. This is non-public information by somebody in the Department saying, this is what we were thinking. And, you know, the Federal Register Act, the whole idea is that you interpret regulations by public statements, not by private intent of the government officials. Your Honor, I think this Court could, I don't think it needs to, but it could entirely discard or ignore the false declaration and would still have to vote for the government in this case based upon all the evidence that's in the record. What is the public interpretation that the Department made about the meaning of this regulation? Well, first of all, from 1994 until 2007, it was the responsibility of the local passport agencies to publicize the rules requiring refunds. That's stated in the declarations. Beginning in 2007, before a plaintiff became eligible for a refund, the Department's website listed an email address and a fiscal address that you could write to to obtain a refund. Okay, where do we find that? That is in the record. It's on page 1274 in the Federalist. This is the statement that's here on the website. If this Court were looking for evidence of the practice of the local branches being responsible for publicizing, that's at pages 1157 and 1161 in the declarations of Ms. Fultz. It says here on 1274, customers should submit a written request with the passport number of available, name, date, place of birth, and approximate dates they collect the passport. It makes clear that if you want a refund, you simply should request it. That is and has been the Department's interpretation since the beginning. It doesn't say must submit, does it? No, I think that's very clear from the import of providing. Customers should submit a written request. I mean, I think that's a very clear import of the label. Ever since passport instruction 2075, the day this regulation went into effect. But that's not a public document. It was not a public document. Then why should we use that to interpret the regulation? Because the question in regulatory interpretation, as this Court has repeatedly observed, is what was the intent of the agency. No, what we have repeatedly said at your request, the Department's request, is that we'd limit the examination to public statements about the meaning of the regulation, not private statements. No, Your Honor. If this Court concludes that those were irrelevant, then prior to 2007 there would be no public statement. But we don't believe that it is irrelevant, that instruction 2075 and 2060. What case do you have that suggests that private government documents not made public are to be given weight in the interpretation of a regulation? What case says that? Well, Your Honor, the question is what is the intention. What case says that you can use private internal documents to interpret a regulation? I do not have a case on point, Your Honor. But I do think, as you pointed out in the prior argument, the consistent practice of the government in structuring its refund system is also very solid evidence of what the Department interpreted and understood the regulation to mean. The only way that the plaintiff can prevail in this case is if it convinces the Court that the language and use of the word will unambiguously only requires automatic refunds. That is the only way that the plaintiff can prevail in this case. And they have provided no evidence of that. It isn't only, really. It's congressional intent. And I do think there's a good point to be made that if Congress had intended that a request be made for refund, they would not have used such simple and straightforward declaratory language that it will be refunded. If you don't meet the three days, you send the password, and you give back the funds that were sent with the expedited request. I have two brief responses, Your Honor. First of all, Congress did not put that language in. The agency did. That is the agency's own regulation. And under cases like Seminole Rock, that's why this is a higher level of deference than Chevron. Because Congress simply allowed the agency to promulgate the regulation. Well, the question is deference to what? You've got to have a public statement to defer to, not some private, unexpressed intent. Your Honor, and my second, I believe this goes to the second response I was going to give to Judge Newman, which is that even in ordinary, everyday parlance, the way that the regulation is written, it is mandatory, but that does not connote that it's automatic. If you take, for example, going into, say, Best Buy or an electronics store, they may well have a publicized policy that, you know, we will refund the difference if somebody else sells this product for less. I wouldn't assume as a customer that Best Buy is going to figure out that a certain city put it on sale, and is going to mail me a check for the difference. Rather, I would assume as a matter of ordinary usage, it would be my obligation to go ask for it. That's simply all we are doing here is interpreting when the State Department says a refund will be made, did they mean automatically? And all of the evidence in this case, their conduct, Well, you have the other provision in the regulation when it was issued suggesting that the applicant will be notified and the fee will be refunded. I mean, doesn't that suggest, perhaps, that the government was going to notify people and do the refund automatically? No, Your Honor. First of all, the preemptive language does not create any substantive rights. But it's an interpretation of the regulation. Well, it certainly Now, why isn't this an interpretation of the regulation that suggests that a request isn't necessary? Well, certainly, understood in a historical context, I think you have to remember that in 1994, it would not have been into effect. All of these applications would have been done in person, face-to-face. And, in fact, until 1998, you had to come in and document your travel. It was coming up right away. And so, therefore, Here's a statement about the meaning of the regulation that's in the very report and order that promulgates the regulation. Deal with it. Why does that not suggest that no request is necessary? Well, Your Honor, it's a piece of the puzzle. But less than a week later, 2075 comes out, and it's very clear that a request is required. That is continued in 2060, two years later. Those are not public documents. Yes, Your Honor, but the question of interpretation of the regulation is not solely based on a public statement. You're saying you have no case that suggests it's not based on public statements. You have been unable to cite a case that suggests that you interpret a regulation based on non-public statements. Well, Your Honor, there certainly is the 2007 statement on the website which makes clear that a request is required. And the Department's view is that has been its practice consistently and historically all the way along. If the Department truly intended in the preeminent language to create an automated system, it wouldn't have. It couldn't have designed a system the way it did. That requires manual cross-checking, not just to count the number of days, as opposing counsel said, but to determine specific things. For example, you have to look at hand annotations on the application to determine how much money was paid at the time. You can't do that using a computer system. You have to look and see whether or not the person properly labeled x-ray on the envelope. That will have been marked by whoever was processing it. That couldn't be done using a computer system. Yes, it's also true you have to manually count the days right now. And then you also have to access a separate financial database that was kept separate to protect the interests of the individuals in their financial security and their banking information. That is administered through a specific processing center through the Department in conjunction with the Department of Treasury. If the agency's interpretation of this regulation as requiring a request for refund is so clearly communicated, how do you explain the fact that so few refunds have actually been made? Well, I think there are two things here. I want to dispute vigorously the statistics plaintiff quoted repeatedly in their opening argument. They put this table in their reply brief. It's something that was included in their motion for summary judgment below. In response to that, we filed an opposition and a declaration. It's document 123 in the district court record explaining why those statistics are misleading. We didn't put it in our appellate brief here because it wasn't brought out to the reply. Both the first couple, the expedite requests, and the second couple, the expedite received, are misleading. The number of requests is overstated and the number of expedites received is understated. The reason that the requests are overstated is that the data returned from the database simply tracks who has a yes in the column for expedite. That's not only people like plaintiffs who paid for it on day one. It also includes anyone who was given expedite service without a fee, official diplomatic passports, people whose passports were sitting for a while in the agency. They needed them soon. They were given a free upgrade to expedite processing. It includes people who requested it but failed to pay for it at the time where their check bounced or they canceled the check. It includes ad hoc instances like in 2007 in LA with the wildfires. There were a large number of delays in the department upgraded to expedite for free a large number of people. All of those things are included in the first total. In the second total, it only asks for the number of people who had that yes and then was it done within three days of arrival at the agency. Well, that excludes people who upgraded later after they've been sitting there for 15 days. It would exclude people whose applications were denied outright. So both of those columns are inaccurate and this was placed in the record below and all those statistics are highly inaccurate. It is simply not known what the actual percentages are because it would require, as I just said, a manual hand recount and reevaluation of every single application that produces a yes in the TBIS system. The logistical burden behind that is, as you can understand, considerable. So you say the numbers that were provided shouldn't be considered but you have no alternative numbers. Well, first of all, for a plaintiff's claim, it was very clear she knew a request was required the day that she became eligible. Her complaint at pages 46 and 50 cites the reference on the website to the request requirement and I think that goes back to your question, Judge Day. In her complaint, she said it's clear they require a request as of 2007. We know that she didn't receive the passport on the first request and we know that the money she paid was not refunded. There's no question about that in any case. She did get the second one expedited and processed pre-determined but we're not disputing whether she would be entitled to a refund. Plaintiff could email today to the State Department website and get a refund. But you haven't issued the refund because she didn't file the request? Is that right? Correct, and we offered to treat her lawsuit as a request. She specifically refused, as the judge found at page 10 in her opinion. We have repeatedly tried to process this request. And you declined the refund because there was no request. Is that right? Despite the language of the regulation saying that it shall be refunded. That's correct. We offered to treat it as a refund. Her counsel specifically refused and would not allow us to do so. We have honored that request but the only thing standing in the way of $460 was her counsel's refusal to allow us to treat it as a refund request. They insisted on making a question of whether, not even absent a request, but over an objection. Well, that sounds a bit contrived. Why didn't you just give her the money back? Well, Your Honor, again, we offered to treat it as a request. That's not my question. Why didn't you just give her the money back? You agree you owe her the money, right? Yes, Your Honor. So why is there a case of controversy here? You agree you owe her $60. Why don't you give her the $60? In the government's view, if what you're asking is whether this is moot, it may well be because we believe we've offered her all the relief she's entitled to. But plaintiff's counsel has insisted that the issue is not simply the entitlement to money but whether the entitlement exists notwithstanding a refusal to request it. We have a dispute about that. We don't think that that's accurate or that that's the way the regulation reads. But we believe we've offered her everything to which she's entitled, which is the chance to get her $60. You haven't offered her the $60. You haven't said her the $60. You haven't given her what she's entitled to. Your Honor, we'd be happy to. I don't want to speak for plaintiff's counsel. They may well argue that the case would be not moot because it's capable of repetition because every time a new plaintiff is identified, if we said the money, then in fact that would moot the case. It may be a different cycle. So we have not chosen to try to moot the case and to get it on the ground, but certainly we could moot plaintiff's claims by mailing her a check, I suppose. We have not done so in large part to honor the requests of counsel. I also want to briefly turn to the issue of whether or not there's a contract in this case. And I want to just state very clearly that we think it's inappropriate to take every regulation that promises to provide a service for a fee and convert that into a contract. But even if you did view this as a contract in this case, what is conspicuously missing from their recitation is a provision on how a refund would be obtained. Because Congress has provided in 22 U.S.C. 214 that passport fees are not refundable by law except when there is a regulation authorizing it, the regulation here is essential to the contract. And this court has held, like its predecessor court did, that when a contract involves or turns on the meaning of a regulation, deference principles do not melt away. In this case, you apply the same deference standards to interpreting the regulation that is part of that contract as you would under a regulation itself. It did that in the Santa Fe Engineer's case, 801 F. 2nd and 381. So when a plaintiff argued in a reply group that you would interpret the government against the government, implicitly, therefore, we get no deference on that regulation, that's just wrong. I suggest that next time you come in and argue that secret interpretations of regulations are binding on the court, you look at the history of the Federal Register Act and the Hottewell case, and the government's contention there was somewhat similar to what is here now, that, you know, we had the regulations in the drawer and they were still binding. And the Supreme Court didn't quite agree with that. Your Honor, that's a very different situation than this. We've never argued that we have some sort of secret regulation. The regulation is very public. It's not just a secret interpretation. No, Your Honor, it's consistently applied. I will note that plaintiffs do cite tens of thousands of refunds being issued. It's not as if refunds were not provided when people requested them. And we have provided on our website, since 2007, since before this case came up, the clear requirement that you submit a written request, even by email, and the passport instructions, which are clearly binding on the agency and clearly demonstrate the agency's understanding of the system and how it should be set up, since day one of the regulation, have required a request. Admittedly, would it have been better if the regulation said on its face either an automatic or a non-request? Yes. But it did not. And the question this Court is facing is, in light of the way it's been litigated, does it unambiguously require an automatic refund? If it does not, on the face of the regulation, then plaintiff loses. It's that simple. Okay. Thank you, Mr. Vacker. Thank you. Mr. Sargent. Your Honors, I have several points. First, the dispute about the statistics. First of all, we have only the statistics the State Department has been willing to give us. They're now disputing that these are somehow inaccurate. I don't know what to say. But we can say this, that the memorandum from Maura Harkey, the head of Counselor Affairs, to the Undersecretary of State, on July 18, 2007, specifically said, as of July 1, Counselor Affairs had received approximately 1.3 million applications for which an expedited fee was paid. The cost to the Department of refunding all of these applicants would be $78 million. Expedited passport application fee refunds will be provided on the expedited fee revenues accrued and retained by the Department of State. Currently, those funds are not retained by Counselor Affairs in violation of the law and are instead used to fund critical Department information technology investments. If a significant number of applicants make requests, providing refunds could significantly reduce funding for Department priorities. In terms of actual refund requests, Counselor Affairs has received approximately 1,600 written requests as of July 1, $96,000. That's the difference between 1.3 million applications and 1,600 refund requests. That's less than two-tenths of a percent, I believe. So whatever the precise figure is, it's clear that well over 99% of people never get their money back. As for the website document, I'd like to direct the Court's attention to the specific language. It says, applicants who paid for expedited service received priority attention. It doesn't say anything about three days. We process those applications more quickly than those receiving routine service. And then it goes on to say, travelers who paid the $60 fee for expedited service and have reason to believe they did not receive expedited service should do this. Where does it say, if you didn't have your passport processed within three days, you're entitled to get your money back? It doesn't say that. They went out of their way to avoid telling people what their legal right was. And I'd like to come back to, oh, by the way, as for the issue about saying that we never, we refused the refund request or something like that, I believe the Declaration of Clarence False actually says there was no refund request because there was no letter to the address specified. I don't have the precise citation, but it's in the record, it's in the appendix. And finally, I want to get back to the instructions 2075 and 2060, because counsel continues to say that those unambiguously show what the internal policy was, that there was a refund requirement. A reasonable examination of those two documents indicates just the opposite. The internal operating procedures, the official operating procedures that went out to the agencies, directed the agencies, not the applicants, to send in those refund requests, to fill them out and send them in to the accounting department. And it was their responsibility. Okay. Thank you, Mr. Sargent. The case is taken under submission. All rise. The hour of report is adjourned until tomorrow morning at 10 a.m.